UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JESSIE J GRACE, III** | **CIVIL ACTION** |
| **VERSUS** | **NO. 02-3818** |
| **N. BURL CAIN** | **SECTION "H"(4)** |

### ORDER AND REASONS

Before the Court is a Petition for Writ of Habeas Corpus (Doc. 25). During the course of its review of this matter, the Court has concluded that disclosure of grand jury testimony is warranted. Because the testimony reveals the presence of several new claims, the Court STAYS this matter to permit Petitioner the opportunity to properly exhaust his new claims in state court.

### BACKGROUND

Petitioner Jessie Grace was convicted of second degree murder on January 14, 1994, after a jury trial in Louisiana state court. His conviction and sentence

1

became final on October 27, 1994.  Petitioner sought post-conviction relief in Louisiana state court.  The denial of that petition became final on May 24, 2002.  On March 26, 2003, Petitioner filed a petition for writ of habeas corpus before this Court.  Judge Duplaintier dismissed the petition without prejudice but granted Petitioner leave to refile the petition after exhausting his state court remedies.  Petitioner returned to this Court and filed an Amended Petition on July 30, 2012.  This petition is presently before the Court.

The Amended Petition was referred to a Magistrate Judge to submit proposed findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  After the State responded to the Amended Petition, the Magistrate Judge issued a Report recommending that the Amended Petition be dismissed with prejudice because Petitioner's claims were procedurally defaulted.[1]  Petitioner objected to the Report, conceding that his claims were procedurally defaulted, but arguing that he was nonetheless entitled to review of the Amended Petition under the Supreme Court's decisions in *Schlup v. Delo* and its progeny.[2]  This Court granted Petitioner's objections in part, finding that Petitioner had presented sufficient evidence of his innocence to warrant an evidentiary hearing.[3]  The

---

[1] R. Doc. 36.

[2] 513 U.S. 298 (1995).  *Schulp* held that a petitioner may obtain review of a successive habeas petition if he can demonstrate that he is actually innocent of the crime for which he was convicted.  *Id.* at 316–17.  The Supreme Court later held that a showing of actual innocence was sufficient to overcome procedural default, *House v. Bell*, 547 U.S. 518, 522 (2006), and a statute of limitations defense, *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1932 (2013).

[3] R. Doc. 36.

Court held an evidentiary hearing and ordered both pre- and post-hearing memoranda. At the evidentiary hearing, Petitioner called a representative of the Jefferson Parish District Attorney's Office, Terry Boudreaux, as a witness. Mr. Boudreaux testified that he received a subpoena for the District Attorney's file related to Petitioner and had turned over certain documents to Petitioner. Mr. Boudreaux, however, declined to disclose certain non-discoverable documents, including the grand jury testimony. Petitioner requested that the Court conduct an *in camera* review of the withheld portions of the file to determine whether disclosure was proper.

## LAW AND ANALYSIS

The Court has reviewed the file and concludes that portions of the grand jury testimony must be disclosed to Petitioner because the testimony reveals the existence of potential habeas claims previously unavailable to Petitioner. In light of this previously undisclosed testimony, this Court believes that Petitioner may have unexhausted *Brady*,[4] *Napue*,[5] and *Giglio*[6] claims. In this Order, the Court first explains the basis for its authority to order the disclosure of the testimony. Second, the Court explains why the content of the testimony merits disclosure. Finally, the Court considers what procedural steps are necessary in light of the new evidence.

---

[4] *Brady v. Maryland*, 373 U.S. 83 (1963).

[5] *Napue v. People of State of Illinois,* 360 U.S. 264 (1959).

[6] *Giglio v. United States*, 405 U.S. 150 (1972).

## I. The Court's Authority to Disclose the Grand Jury Testimony

Louisiana Code of Criminal Procedure article 434 provides, in pertinent part, that "all persons having confidential access to information concerning grand jury proceedings, shall keep secret the testimony of witnesses and all other matters occurring at, or directly connected with, a meeting of the grand jury." The article contains a few specific exceptions, none of which appear to be applicable to the present case. The Louisiana Supreme Court has, however, held that grand jury testimony may nonetheless be disclosed to a criminal defendant under certain circumstances:

> In some situations justice may require that discrete segments of grand jury transcripts be divulged for use in subsequent proceedings. Thus a trial court may act upon a specific request stated with particularity and review grand jury transcripts *in camera* to determine if information contained therein is favorable to the accused and material to guilt or punishment. The party seeking disclosure bears the burden to show a compelling necessity for breaking the indispensable secrecy of grand jury proceedings. He must show that, without the material, his case would be greatly prejudiced or that an injustice would be done. If allowed, disclosure must be closely confined to the limited portion of the material for which there is particularized need. In any event, disclosure is left to the sound discretion of the trial court whose ruling will not be reversed absent an abuse of that discretion.[7]

Thus, before the Court can disclose any portion of the grand jury testimony to Petitioner, it must find that there is a compelling necessity for the disclosure

---

[7] *State v. Higgins*, 898 So. 2d 1219, 1241 (La. 2005).

4

and that, in the absence of the disclosure, Petitioner would be greatly prejudiced. The Court finds that disclosure is warranted.

## II. The Merits of Disclosure

In assessing the merits of disclosure, the Court must necessarily discuss the evidence that formed the basis of Petitioner's conviction.

Petitioner was convicted of the murder of Wayne Palmer. The evidence at trial demonstrated that, on the day of the shooting, Palmer traveled to the Jefferson Place apartment complex with his girlfriend Michelle Temple. Upon arriving at the complex, Palmer approached two individuals, Sherman Moses and Troy McCloud, seeking to purchase a quantity of crack cocaine. Neither Moses nor McCloud had any crack for sale, but Moses led Palmer to another group of men. One of the men in the group indicated that he had some crack for sale. Palmer then accompanied several individuals into an alley to consummate the sale. A few minutes later, Palmer ran out of the alley. As Palmer was running, he was shot twice. One of the gunshot wounds caused his death. These underlying facts appear to be relatively undisputed.

### The Investigation

The investigation into Palmer's death did not reveal any usable physical evidence or a murder weapon. The Jefferson Parish Sheriff's Office was, however, able to contact and interview two witnesses on the day of the shooting. The first, Temple, told detectives that she did not see and could not identify the shooter. The only individuals present at the scene whom she recognized were

5

Moses and "Jermal."[8]  She reported that, after she saw Palmer fall to the ground, she ran up to him.  As she was running up to Palmer, she saw a short, dark-skinned black man wearing blue "dickie" pants and a black or dark blue Raiders shirt kneeling over Palmer and holding something to Palmer's head.  When she arrived at Palmer's side, a second individual wearing a striped shirt threatened her.

Detectives also interviewed Moses on the day of the shooting.  Moses told detectives that only two individuals accompanied Palmer into the alley, Petitioner and Derek Hudson.  Moses stated that Hudson was attempting to sell Palmer crack when Petitioner suddenly pulled out a pistol and ordered Palmer to give up his money.  Moses told detectives that Petitioner shot Palmer as he ran away.  When pressed by detectives as to whether he had actually seen the shooting, Moses said that he had not.[9]  Moses reported that Petitioner was wearing a khaki shirt and pants and that Hudson was short and wearing blue dickies and a black and gold Saints shirt.

**The Trial**

At trial, the State called Moses, Temple, and Hudson to testify.  Temple's testimony was largely consistent with her statement to detectives.  She reiterated that she did not know who shot Palmer and that the lead detective, Sgt. Snow, had showed her several photos but that she could not identify anyone.

---

[8] "Jermal" was never identified.

[9] The precise statement was: "Q: You saw [Grace] pull the gun and shoot him?; A: I aint saw it, you can put it like that, he killed him.  He killed him cause he was the only asshole that do shit like that."

Moses's testimony, however, differed significantly from his previous statement. At trial, Moses offered substantially more detail than he had originally provided the detectives. He testified that, after Petitioner and Hudson went into the alley, Petitioner struck Palmer in the face with his gun. Hudson then reached over, took Palmer's jewelry, and told Petitioner that he could have the money. Palmer began pleading, "Please, don't shoot me," just before Petitioner shot him. After being shot, Palmer got up and ran a short distance. While he was running away, Petitioner shot Palmer three more times, hitting him in the back of the head.

Moses admitted that he was on drugs at the time of the shooting. He also admitted that he had previously been convicted of purse snatching and motorbike theft and that he had a pending charge for possession of stolen property. He testified that, despite his pending charge, the State had not made any promises to him in exchange for his testimony. On cross examination, Moses admitted that he gave a statement to detectives on the day of the shooting. Moses was specifically asked whether he had told the police that he did not actually see the shooting. He denied making such a statement. The trial judge did not permit the defense attorney to impeach Moses with the prior statement.

Hudson testified that, on the day of the shooting, he did not have any drugs available for sale. According to Hudson, it was Petitioner who attempted to sell crack to Palmer in the alley. Hudson testified that, after Petitioner sold the drugs to Palmer, Petitioner hit Palmer in the face with his gun, robbed him,

7

and shot him as he ran away. Hudson claimed that he was a mere bystander to the shooting.

The trial court held a hearing outside the presence of the jury to determine whether Hudson had been offered anything by the State in exchange for his testimony. Hudson testified that, in the weeks before trial, he was arrested on charges of possession and distribution of cocaine. While he was in jail, he was approached by Sgt. Snow and the District Attorney's office. He testified that they "reminded him about the shooting at Jefferson Place" and asked him if he remembered being there and seeing what happened. He testified that he told them his version of events and insisted that he was never promised anything in exchange for his testimony. On cross-examination, he admitted that he never made any attempt to contact anyone regarding the shooting and that he was interviewed for the first time approximately one week before trial. He also testified that he was offering testimony at the trial because he "wanted to get out" and he "didn't want to go down." The trial judge found that there was no deal in place and ruled that the jury would not be permitted to know that Hudson was in jail or that he had pending criminal charges.

**The Grand Jury**

Before the grand jury, Sgt. Snow testified that she interviewed Moses during the course of the investigation. Sgt. Snow testified that Moses told her that Hudson and Petitioner beat and robbed Palmer before shooting him. As a result of this evidence, Sgt. Snow testified that "we'll be getting a warrant for him [Hudson] shortly." In response to further questioning regarding Hudson's

8

proposed charge, she testified "First degree murder since he was with the subject. They robbed him and shot him. [Hudson] did the robbing. It was a cooperative effort on both of them." Of particular interest to this Court, is the fact that there is no evidence that Sgt. Snow or anyone associated with this case found or spoke to Hudson anytime before he was "reminded about the shooting at Jefferson Place" the week before trial. It seems incredible, at least to this Court, that when he was questioned regarding the Palmer murder, Hudson was not advised of his potential criminal culpability in the very matter in which he would be called to testify. Indeed, before visiting with Hudson to secure his testimony, Sgt. Snow anticipated charging him with first degree murder.[10]

Sgt. Snow's grand jury testimony deviates from her trial testimony in another area. At trial, Sgt. Snow testified that she showed a lineup (which included Petitioner) to Temple but that Temple was unable to make a positive identification. Before the grand jury, however, Sgt. Snow testified that Temple was able to identify Petitioner as being present at the scene.

Temple provided conflicting testimony to the grand jury. Temple testified she actually saw the shooting, that she could identify the Petitioner as the man who shot Palmer, that she saw Petitioner holding a gun to Palmer's head, and that she had identified Petitioner in a lineup. Given the gross disparities between Temple's grand jury and trial testimony, it is simply impossible that she was telling the truth on both occasions.

**Compelling Necessity for Disclosure**

---

[10] Both the grand jury testimony and Moses's testimony at trial would appear to support such a charge.

9

The Court cannot, however, disclose the grand jury testimony merely because its content makes the Court uncomfortable. Instead, the Court must find that there is a "compelling necessity" for the disclosure.[11] In the instant case, the Court finds that the new evidence contained in the transcript reveals new habeas claims with potential merit.

The disclosed testimony reveals that Sgt. Snow and Temple gave grand jury testimony that was not consistent with their trial statements. Additionally, it raises significant questions regarding whether Hudson was testifying in exchange for not being charged for his part in the murder. There can be no doubt that the State was obligated to disclose this impeachment evidence to Petitioner at trial.

In *Napue*, the Supreme Court held that the government may not constitutionally use false testimony in order to secure a conviction, even if that false testimony pertains only to the credibility of the witness.[12] In *Giglio*, the Court held that, if the state is in possession of the impeachment evidence, it is obligated to disclose it, even if the trial attorney is not personally aware of it.[13] In *LaCaze v. Warden, Louisiana Correctional Institute for Women*, the Fifth Circuit explained that the state's responsibility to disclose impeachment evidence related to its own witnesses is broad.[14] The prosecution's disclosure duty is particularly broad with regard to incentives given to its own witnesses

---

[11] *Higgins*, 898 So. 2d at 1241.

[12] *Napue*, 360 U.S. at 269–70.

[13] *Giglio*, 405 U.S. at 154.

[14] 645 F.3d 728, 735 (5th Cir. 2011).

10

in exchange for their testimony. Indeed, the prosecution is obligated to disclose to a defendant any evidence that "the witness 'might have believed that [the state] was in a position to implement ... any promise of consideration.'"[15] A firm promise of future benefit is not required.[16]

In light of these basic legal principles, it seems clear to this Court that the grand jury testimony should have been disclosed to Petitioner at trial. However, that alone does not entitle Petitioner to relief. In addition to proving that the State's failure to disclose the grand jury transcript violated his constitutional rights, Petitioner must show that the withheld evidence was material.[17] Evidence is material if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."[18] In assessing the materiality of withheld evidence, courts must consider the cumulative effect of all withheld evidence.[19] It appears to this Court that further factual development is required in order to answer this question. For example, Hudson and Sgt. Snow will likely need to testify regarding the nature of their pre-trial conversations. Additionally, the closing arguments from Petitioner's trial will probably need to be transcribed as courts faced with this issue often look to the degree to which the prosecution vouched for the witness in closing arguments.[20] Nonetheless, there is a compelling argument that the withheld testimony is

---

[15] *Id.* at 735 (alterations in original) (quoting *Napue*, 360 U.S. at 270.).

[16] *Tassin v. Cain*, 517 F.3d 770, 778 (5th Cir. 2008).

[17] *LaCaze*, 645 F.3d at 736.

[18] *Id.*

[19] *Kyles v. Whitley*, 514 U.S. 419, 436–37 (1995).

[20] *See, e.g.*, *Giglio*, 405 U.S. at 152; *Tassin*, 517 F. 3d at 779.

11

material. The grand jury testimony, together with Moses's pre-trial statement, raises significant credibility concerns regarding all three of the State's witnesses who were present at the murder as well as its lead investigator. Accordingly, in this Court's view, the new claims revealed by the grand jury testimony are potentially meritorious.

In light of the constitutional concerns created by the content of the grand jury transcript, the Court finds that there is a compelling necessity for disclosure. Additionally, the Court finds that Petitioner would be prejudiced without disclosure. Absent disclosure of the transcript, there is no conceivable way that Petitioner could discover this potential constitutional error.

The Court will not, however, disclose the entire transcript. As the Louisiana Supreme Court has cautioned, "disclosure [of grand jury testimony] must be closely confined to the limited portion of the material for which there is particularized need."[21] Therefore, the Court has redacted the transcript and will disclose only the portions that are necessary to reveal the potential constitutional infirmities. Additionally, the Court discloses the redacted transcript under seal and directs counsel for Petitioner to take appropriate steps to ensure that the transcript is not disclosed except as necessary to present Petitioner's claims to a Louisiana state court.

### III. Procedural Issues

The Court's disclosure of the grand jury transcript creates a new procedural issue. As a result of the Court's disclosure, Petitioner may be able to

---

[21] *Higgins*, 898 So. 2d at 1241.

assert *Napue*[22] and *Giglio*[23] claims. However, given the current procedural posture of this case, this Court is not able to review those claims. "A fundamental prerequisite to federal habeas relief under § 2254 is the exhaustion of all claims in state court prior to requesting federal collateral relief."[24] The doctrine of exhaustion requires that Petitioner present his claims to the Louisiana Supreme Court.[25] Because Petitioner will discover his claims for the first time when the Court enters this Order, he will necessarily not have presented these claims to the Louisiana Supreme Court. However, if a state procedural rule would prohibit Petitioner from presenting these new claims in Louisiana state court, then the claims are "technically exhausted."[26] Therefore, the Court must consider whether there is a procedural rule preventing petitioner from bringing these claims before a Louisiana state court.

There are two possible procedural obstacles that Petitioner faces upon raising these new claims in state court. First, Louisiana Code of Criminal Procedure article 930.8 provides that applications for post-conviction relief must generally be filed within two years after the petitioner's conviction and sentence become final on direct appeal. Article 930.8, however, provides an exception if the facts underlying the claim were previously unknown to the petitioner and the petitioner exercised diligence in pursuing his post-conviction claims. This

---

[22] 360 U.S. 264.

[23] 405 U.S. 150.

[24] *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998).

[25] *Id.*

[26] *Woodford v. Ngo*, 548 U.S. 81, 93 (2006).

Court believes that Petitioner could not have known the facts underlying these new claims prior to the entry of this Order. Furthermore, the evidence reviewed by this Court demonstrates that Petitioner pursued this claim with diligence.

Petitioner requested a copy of the District Attorney's file in connection with his first application for post-conviction relief. At that time, the District Attorney represented that the file could not be located. Despite this representation, Petitioner renewed his request for the file on several occasions. Most recently, Petitioner subpoenaed the file in connection with the instant matter. At the evidentiary hearing, Mr. Boudreaux testified that his office had finally located the file but declined to turn over portions of it, including the grand jury transcript.

The State's argument that this claim should have been raised years ago ignores the reality of its final disclosure. The Court cannot imagine how Petitioner could have possibly raised a claim arising out of a document that the State initially represented was lost and then refused to disclose. Accordingly, this Court does not believe that article 930.8 would prevent Petitioner from asserting any new claims arising out of the grand jury testimony.

The second possible procedural obstacle is found in article 930.4. Article 930.4 provides, in pertinent part, that Louisiana courts will not a consider post-conviction application that either (1) alleges a claim that "petitioner had knowledge [of] and inexcusably failed to raise in the proceedings leading to conviction,"[27] or (2) "raises a new or different claim that was inexcusably omitted

---

[27] La. Code Crim. Proc. art. 930.4(B).

14

from a prior application."[28] This Court believes that article 930.4 has no application in this matter. As previously discussed, the Court believes that there is no reasonable argument that Petitioner knew or should have known about the content of the grand jury transcript before the issuance of this Order.

In light of the foregoing, this Court concludes that any new claims revealed by the grand jury transcript are not technically exhausted. Accordingly, this Court cannot consider the issues in this proceeding until the new claims are properly exhausted in Louisiana state court.

In light of this reality, the Court must consider how best to proceed. If Petitioner desires to amend his Petition to assert these new claims, the Court would be faced with a "mixed petition" containing both exhausted and unexhausted claims.[29] In *Rhines v. Weber*, the Supreme Court held that a district court should stay a habeas proceeding involving a mixed petition if "the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics."[30] This Court has no difficulty concluding that such circumstances are present in this case. The Court has already explained that Petitioner has good cause for his failure to exhaust these new claims and that the claims may have merit. Additionally, there is absolutely no evidence that Petitioner has intentionally sought to delay this

---

[28] *Id.* art. 930.4(D).

[29] *See Rhines v. Weber*, 544 U.S. 269, 271 (2005).

[30] *Id.* at 278. Indeed, the Court stated that it would be an abuse of a district court's discretion to deny a stay in such circumstances.

proceeding. Accordingly, this Court finds that a stay of this case is warranted.

This stay is not, however, without limits. The Supreme Court has instructed district courts to place reasonable time limits on a stay entered under these circumstances.[31] Accordingly, the Court orders Petitioner to pursue these new claims in state court within 30 days of the entry of this order and return to this Court no later than 30 days following the final conclusion of the state proceedings.

---

[31] *Id.* (quoting *Zarvela v. Artuz*, 254 F.3d 374, 381 (2d Cir. 2001) ("[District Courts] should condition the stay on the petitioner's initiation of exhaustion within a limited period, normally 30 days, and a return to the district court after exhaustion is completed, also within a limited period, normally 30 days.")).

## CONCLUSION

For the foregoing reasons, this matter is STAYED AND ADMINISTRATIVELY CLOSED pending Petitioner's exhaustion of the new claims presented by the grand jury transcript in state court. If Petitioner fails to file a petition in Louisiana state court within 30 days of the entry of this order, any party may move to lift of the stay. Petitioner is FURTHER ORDERED to move to lift the stay or dismiss this case (if the state court grants his application) no later than 30 days following exhaustion of his state court remedies.

New Orleans, Louisiana, this 13th day of January, 2015.

_____
**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**