## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**JESSIE JAMES GRACE, III**                    **CIVIL ACTION**

**VERSUS**                                                    **NO. 02-3818**

**BURL CAIN, WARDEN**                         **SECTION "H"(2)**

## ORDER AND REASONS

Before the Court are Petitioner Jessie James Grace, III's Amended Petition under 28 U.S.C. § 2254 (Doc. 25) and Corrected Second Supplemental Petition under 28 U.S.C. § 2254 (Doc. 122). For the following reasons, Petitioner's Amended Petition for habeas relief is **DENIED**, and his Corrected Second Supplemental Petition for habeas relief is **GRANTED**.

## BACKGROUND

### I.      Status of the Case

On March 26, 2003, Petitioner Jessie James Grace, III filed *pro se* in this Court a federal petition for habeas corpus relief pursuant to 28 U.S.C. § 2254 related to the 1994 Jefferson Parish second degree murder conviction for which he is serving a life sentence.[1] His petition was dismissed without prejudice for failure to exhaust state court remedies.

---

[1] Doc. 2 at p. 1, 13.   Petitioner asserted *pro se* eleven claims in that petition.

1

On August 1, 2012, Petitioner was granted leave to re-open this case, and he, through counsel, filed an Amended Petition asserting only three claims: (1) The state trial court denied Petitioner's confrontation rights when it denied Petitioner the opportunity to cross-examine Derek Hudson about his then pending drug charges and any expectation of leniency in return for his testimony; (2) The prosecution allowed both eyewitnesses to the crime to give patently false testimony on crucially material matters, thereby denying Petitioner's due process rights under *Napue v. Illinois*, 360 U.S. 264 (1959); and (3) Trial counsel rendered ineffective assistance of counsel in failing properly to use pretrial statements of Michelle Temple, Sherman Moses, and Derek Hudson. The magistrate judge recommended dismissal of these claims because they were procedurally defaulted. Petitioner objected to that recommendation, conceding that his claims were procedurally defaulted, but arguing that he was nonetheless entitled to review of the Amended Petition under the Supreme Court's decisions in *Schlup v. Delo* and its progeny.[2] This Court granted in part Petitioner's objections and scheduled an evidentiary hearing on the actual innocence exception.[3] Hearings were held April 16 and May 20, 2014, and post-trial briefing was ordered.[4]

On January 13, 2015, the Court ordered production of portions of the state grand jury transcript discovered during in camera review for Petitioner to exhaust potential claims under *Napue v. Illinois*, *Brady v. Maryland*, 373

---

[2] 513 U.S. 298 (1995). *Schlup* held that a petitioner may obtain review of a successive habeas petition if he can demonstrate that he is actually innocent of the crime for which he was convicted. *Id.* at 316–17. The Supreme Court later held that a showing of actual innocence was sufficient to overcome procedural default, House v. Bell, 547 U.S. 518, 522 (2006), and a statute of limitations defense, McQuiggin v. Perkins, 133 S. Ct. 1924, 1932 (2013).

[3] Doc. 36.

[4] Docs. 85, 86, 90, 92–96.

2

U.S. 83 (1963), and/or *Giglio v. United States,* 405 U.S. 150 (1972). The Court stayed this matter and withheld ruling on the procedural default/actual innocence exception to allow for exhaustion of state court review on any new claims arising out of the grand jury testimony.

On March 26, 2019, this matter was reopened, and having exhausted his state court remedies, Petitioner filed a Second Supplemental Petition asserting a *Brady* claim arising out of the grand jury testimony.[5] The magistrate judge prepared a Report and Recommendations, recommending Petitioner's Second Supplemental Petition be denied and dismissed with prejudice.[6] This Court declines to adopt the magistrate's recommendation and instead enters the following Order and Reasons. After providing a detailed overview of the history of this case, the Court will address the claims in both Petitioner's Amended Petition and his Corrected Second Supplemental Petition.

## II.    Factual and Procedural Background

On March 11, 1993, a Jefferson Parish grand jury indicted Petitioner Jessie James Grace, III for the first degree murder of John Wayne Palmer.[7] The charge was later amended on September 9, 1993, to second degree murder.[8] The Louisiana Fifth Circuit Court of Appeal summarized the facts established at trial as follows:

> During the afternoon of February 21, 1993, the victim, John Wayne Palmer, and his girlfriend [Michelle Temple],[9] drove to the Jefferson Place Apartments in Marrero, Louisiana in order to

---

[5] Doc. 122.

[6] Doc. 141.

[7] St. Rec. Vol. 1 of 27, Indictment, 3/11/93; Grand Jury Return, 3/11/93.

[8] *Id.* (handwritten amendment dated 9/9/93).

[9] *See* Doc. 25-14 at p. 26–27 (Trial Transcript, 1/14/94) (testimony of Michelle Temple, identifying herself as the victim's girlfriend).

3

purchase crack cocaine. Palmer exited the vehicle and asked two men, Derek Hudson and Sherman Moses, if they had any crack cocaine. Although Hudson and Moses were unable to supply the victim, they brought him to the defendant who was standing nearby. The defendant momentarily left the group and returned with drugs and a gun, identified by Moses as a "black 38, snub nose." The defendant then requested that the victim follow him to a nearby alleyway. According to Hudson and Moses, the victim paid the defendant and the defendant gave the victim drugs. However, the defendant suddenly struck the victim in the mouth with his gun and demanded that he relinquish the drugs and his money. The victim complied and pleaded for his life and proceeded to turn in order to leave the area when he was shot from behind, twice, by the defendant.

The autopsy performed on the victim revealed that he died as result of gunshot wounds above the right ear and on the right side of his back. Both bullets were fired from a gun behind and to the right of the victim at a distance greater than twelve inches. There were lacerations near the victim's mouth indicated that the victim had been struck by a blunt instrument.[10]

Petitioner was tried before a jury on January 11 through 14, 1994, and found guilty as charged of second degree murder.[11]  On February 2, 1994, the state trial court sentenced Petitioner to life in prison without benefit of probation or parole.[12]

On direct appeal to the Louisiana Fifth Circuit, Petitioner argued that the state trial court erred in prohibiting his attorney from questioning Derek Hudson at trial about his arrest on drug charges and any promise of leniency

---

[10] State v. Grace, 643 So. 2d 1306, 1307 (La. App. 5th Cir. 1994); St. Rec. Vol. 1 of 27, 5th Cir. Opinion, 94-KA-295, p. 2, 9/27/94.

[11] St. Rec. Vol. 1 of 27, Trial Minutes, 1/11/94; Trial Minutes, 1/12/94; Trial Minutes, 1/13/94; Trial Minutes, 1/14/94; St. Rec. Vol. 4 of 27, Trial Transcript, 1/13/94; St. Rec. Vol. 5 of 27, Trial Transcript (continued), 1/13/94; Trial Transcript, 1/14/94; St. Rec. Vol. 6 of 27, Trial Transcript (continued), 1/14/94. The relevant trial transcripts are attached to Grace's Amended Petition (Rec. Doc. 25) at Docs. 25-13, 25-14, and 25-15.

in return for his testimony.[13] On September 27, 1994, the appellate court affirmed Petitioner's conviction, finding the claim meritless and amended the sentence to include credit for time served.[14]

Petitioner's conviction became final 30 days later, on October 27, 1994, when he did not file for rehearing or seek review in the Louisiana Supreme Court.[15] More than fourteen months later, on January 9, 1996, Petitioner submitted an application for post-conviction relief to the state trial court, challenging the constitutionality of his conviction and asserting *Brady* violations, insufficient evidence, unfair trial, and ineffective assistance of counsel in the presentation of alibi evidence.[16] At a March 4, 1999, hearing, Petitioner's counsel narrowed the claims to *Brady* and ineffective assistance of counsel.[17] The State sought dismissal because the claims could have been asserted on direct appeal and otherwise were not supported by the record. The state trial court granted the motion and dismissed Petitioner's application.[18]

Petitioner filed a writ application with the Louisiana Fifth Circuit that was granted on January 14, 2000, and the matter was remanded because the

---

[12] St. Rec. Vol. 1 of 27, Sentencing Minutes, 2/2/94.

[13] *Grace*, 643 So. 2d at 1307; St. Rec. Vol. 1 of 27, 5th Cir. Opinion, 94-KA-295, p. 2, 9/27/94; Assignment of Errors, 3/31/94.

[14] *Grace*, 643 So. 2d at 1309; St. Rec. Vol. 1 of 27, 5th Cir. Opinion, 94-KA-295, p. 7, 9/27/94.

[15] Butler v. Cain, 533 F.3d 314 (5th Cir. 2008) (holding that appeal is final when the state defendant does not timely proceed to the next available step in an appeal process) (citing Roberts v. Cockrell, 319 F.3d 690, 694–95 (5th Cir. 2003)).

[16] St. Rec. Vol. 1 of 27, Application for Post-Conviction Relief, dated by Grace 1/9/96. The application was filed February 2, 1996. *See* St. Rec. Vol. 1 of 27, Hearing Transcript, p. 4, 3/4/99.

[17] St. Rec. Vol. 1 of 27, Hearing Transcript, pp. 4, 8–9, 3/4/99; St. Rec. Vol. 2 of 27, Hearing Minutes, 3/4/99; Naomi R. Brown's Affidavit, 1/9/99; Phyllis E. Montgomery's Affidavit, 1/18/99.

[18] St. Rec. Vol. 1 of 27, Hearing Transcript, p. 17, 3/4/99.

state trial court dismissed the application without allowing Petitioner to state reasons for his procedural default and without addressing the ineffective assistance of counsel claim.[19]

At a November 2, 2000 hearing, the state trial court heard testimony and received affidavit evidence related to the alleged alibi witnesses that were not called by the defense at trial.[20] The state trial court thereafter orally denied Petitioner's application for post-conviction relief.

On May 22, 2001, the Louisiana Fifth Circuit denied Petitioner's writ application finding no merit in the ineffective assistance of trial counsel claim related to the failure to call alibi witnesses.[21] On May 24, 2002, the Louisiana Supreme Court also denied Petitioner's subsequent writ application without stated reasons.[22]

More than eight-and-a-half years later, on December 1, 2010, Petitioner filed a second application for post-conviction relief in the state trial court based on alleged newly discovered evidence that Petitioner was not the shooter.[23] On April 1, 2011, the state trial court denied the application as untimely under Louisiana Code of Criminal Procedure article 930.8 and as repetitive and/or successive under article 930.4(E).[24]

---

[19] St. Rec. Vol. 2 of 27, 5th Cir. Order, 99-KH-910, 1/14/00; 5th Cir. Writ Application (counsel), 99-KH-910, 8/13/99; 5th Cir. Writ Application (pro se), 99-KH-910, 8/16/99.

[20] St. Rec. Vol. 2 of 27, Hearing Minutes, 11/2/00; St. Rec. Vol. 3 of 27, Hearing Transcript, 11/2/00.

[21] St. Rec. Vol. 2 of 27, 5th Cir. Order, 01-KH-372, 5/22/01.

[22] State v. Grace, 816 So.2d 298 (La. 2002); St. Rec. Vol. 2 of 27, La. S.Ct. Order, 2001-KP-1880, 5/24/02; La. S. Ct. Letter, 2001-KP-1880, 6/25/01.

[23] St. Rec. Vol. 3 of 27, Second Application for Post-Conviction Relief, 12/1/10.

[24] St. Rec. Vol. 4 of 27, Trial Court Order, 4/1/11; see also State's Opposition, 3/1/11; Reply to State's Opposition, 3/9/11; Trial Court Order, 4/6/11. At the time, La. Code Crim. P. art. 930.8 allowed three years from finality of conviction for a defendant to file an application for post-conviction relief. La. Code Crim. P. art. 930.4(E) provides that "[a] successive application may be dismissed if it raises a new or different claim that was inexcusably omitted from a prior application."

On June 24, 2011, the Louisiana Fifth Circuit denied Petitioner's subsequent writ application finding no error in the state trial court's ruling and held that Petitioner had not established a claim based on newly discovered evidence. [25] On March 7, 2012, the Louisiana Supreme Court denied Petitioner's related writ application without stated reasons.[26]

On August 1, 2012, having exhausted his state remedies, Petitioner was granted leave to re-open this habeas petition. On January 13, 2015, the Court ordered production of portions of the state grand jury transcript and stayed this matter to allow for exhaustion of state court review on any new claims arising out of the grand jury testimony.

On February 10, 2015, Petitioner filed a third application for post-conviction relief in the state trial court asserting *Brady* violations based on the grand jury testimony.[27] On July 17, 2017, after an evidentiary hearing and additional briefing, the state trial court granted Petitioner's post-conviction application, vacated Petitioner's conviction, and ordered a new trial.[28]

On November 14, 2017, the Louisiana Fifth Circuit granted the State's writ application and reinstated Petitioner's conviction and life sentence.[29]

---

[25] St. Rec. Vol. 4 of 27, 5th Cir. Order, 11-KH-551, 6/24/11.

[26] State v. Grace, 83 So.3d 1043 (La. 2012); St. Rec. Vol. 4 of 27, La. S. Ct. Order, 2011-KP-1664, 3/2/12; La. S. Ct. Writ Application, 11-KP-1664, 7/25/11; La. S. Ct. Letter, 2011-KP-1664, 7/25/11.

[27] St. Rec. Vol. 12 of 27, Third Application for Post-Conviction Relief, 2/10/15; *see also* State's Response, 4/1/15; Reply Memorandum, 4/24/15; St. Rec. Vol. 18 of 27, State's Response, 2/8/17; St. Rec. Vol. 19 of 27, Reply Memorandum, 3/14/17.

[28] St. Rec. Vol. 19 of 27, Trial Court Order, 7/17/17; Hearing Minutes, 4/28/17; Post-Hearing Memorandum, 5/31/17; State's Post-Hearing Brief, 6/2/17; *see related matters,* St. Rec. Vol. 13 of 27, Trial Court Order, 8/17/15; 5th Cir. Order, 15-KH-640, 12/17/15; St. Rec. Vol. 21 of 27, 5th Cir. Writ Application, 15-KH-640, 10/14/15; State v. Grace, 208 So.3d 376 (La. 2016); St. Rec. Vol. 18 of 27, La. S. Ct. Order, 2016-KP-120, 10/28/16; St. Rec. Vol. 25-27 of 27, La. S. Ct. Writ Application, 16-KP-120, 1/20/16.

[29] St. Rec. Vol. 19 of 27, 5th Cir. Order, 17-KH-451, 11/14/17; St. Rec. Vols. 21–25 of

Although one judge dissented, the state appellate court found the grand jury testimony was not sufficiently material to raise a reasonable probability of a different outcome at trial under *Brady*. Thereafter, the Louisiana Supreme Court, with three justices dissenting, denied Petitioner's subsequent writ application because Petitioner failed to prove that the State withheld material exculpatory evidence in violation of *Brady*. [30] Petitioner subsequently filed the Second Supplemental Petition at issue here.

## LEGAL STANDARD

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254. The AEDPA went into effect on April 24, 1996[31] and applies to habeas petitions filed after that date.[32] The AEDPA therefore applies to Petitioner's Amended and Supplemental Petitions. The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the petitioner's claims were adjudicated on the merits in state court. The petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim.[33]

---

27, 5th Cir. Writ Application, 17-KH-451, 8/16/17.

[30] State v. Grace, 264 So.3d 431 (La. 2017); St. Rec. Vol. 19 of 27, La. S. Ct. Order, 2/25/19; La. S. Ct. Letter, 2017-KP-2070, 12/14/17; St. Rec. Vol. 27 of 27, La. S. Ct. Writ Application, 17-KP-2070, 1/22/18.

[31] The AEDPA was signed into law on that date and did not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law. United States v. Sherrod, 964 F.2d 1501, 1505 (5th Cir. 1992).

[32] Flanagan v. Johnson, 154 F.3d 196, 198 (5th Cir. 1998) (citing Lindh v. Murphy, 521 U.S. 320 (1997)).

[33] Nobles v. Johnson, 127 F.3d 409, 419–20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

Section 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of fact and law in federal habeas corpus proceedings.[34] Determinations of questions of fact by the state court are "presumed to be correct . . . and we will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"[35] The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption.[36] A state court's determination of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference, unless the state court's decision "'was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent.]'"[37] The United States Supreme Court has clarified the § 2254(d)(1) standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.[38]

---

[34] *Id.*

[35] Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000) (quoting 28 U.S.C. § 2254(d)(2)).

[36] 28 U.S.C § 2254(e)(1).

[37] Penry v. Johnson, 215 F.3d 504, 507 (5th Cir. 2000) (quoting Miller v. Johnson, 200 F.3d 274, 280–81 (5th Cir. 2000)), *aff'd in part, rev'd in part on other grounds*, 532 U.S. 782 (2001) (brackets in original); *Hill*, 210 F.3d at 485.

[38] Williams v. Taylor, 529 U.S. 362, 412–13 (2000); *Penry*, 532 U.S. at 792–93; *Hill,*

The "critical point" in determining the Supreme Court rule to be applied "is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question."[39] "Thus, 'if a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'"[40]

"'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly.'"[41] Rather, under the "unreasonable application" standard, "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable."[42]  The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner.[43]

---

210 F.3d at 485.

[39] White v. Woodall, 572 U.S. 415, 427 (2014) (citing Harrington v. Richter, 562 U.S. 86, 103 (2011); Knowles v. Mirzayance, 556 U.S. 111, 122 (2009)); Shoop v. Hill, 139 S. Ct. 504, 506 (2019) (quoting *Harrington*, 562 U.S. at 103).

[40] *White*, 572 U.S. at 426 (quoting Yarborough v. Alvarado, 541 U.S. 652, 666 (2004)); *Shoop*, 139 S. Ct. at 509 (stating that habeas courts must rely "strictly on legal rules that were clearly established in the decisions of this Court at the relevant time").

[41] Price v. Vincent, 538 U.S. 634, 641 (2003) (quoting Woodford v. Visciotti, 537 U.S. 19, 24–25 (2002)) (citations omitted; brackets in original).

[42] Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002).

[43] *Price*, 538 U.S. at 641 (quoting *Woodford*, 537 U.S. at 24–25); Wright v. Quarterman, 470 F.3d 581, 585 (5th Cir. 2006).

## LAW AND ANALYSIS

### I.    Amended Petition

Petitioner brings three claims in his Amended Petition: (1) the trial court denied Petitioner's rights of confrontation by denying the defense the opportunity to cross-examine Derek Hudson about his then pending drug charges and any expectation of leniency in return for his testimony; (2) the prosecutor allowed both eyewitnesses to the crime to give patently false testimony on crucially material matters, thereby denying Petitioner's due process rights under *Napue v. Illinois*, 360 U.S. 264 (1959); and (3) trial counsel rendered ineffective assistance of counsel for failure to properly use the pretrial statements of Michelle Temple, Sherman Moses, and Derek Hudson. Petitioner concedes that each of these claims is procedurally defaulted. Ordinarily, this Court is barred from considering procedurally defaulted claims.[44] Petitioner argues, however, that this Court should review his claims on the merits because he is actually innocent of the crimes of which he was convicted.

Petitioner may avoid the procedural bar to bringing his claims only if a fundamental miscarriage of justice will occur if the merits of his claims are not reviewed.[45] To establish a fundamental miscarriage of justice, Petitioner must provide this Court with evidence that would support a "colorable showing of factual innocence."[46] To satisfy the factual innocence standard, a petitioner must establish a fair probability that, considering all of the evidence now available, "it is more likely than not that no reasonable juror

---

[44] Sones v. Hargett, 61 F.3d 410, 416 (5th Cir. 1995).

[45] *Hogue*, 131 F.3d at 497 (citing Sawyer v. Whitley, 505 U.S. 333, 339 (1992)).

[46] Kuhlmann v. Wilson, 477 U.S. 436, 454 (1986); *accord Murray*, 477 U.S. at 496; *Glover*, 128 F.3d at 902.

would have found petitioner guilty beyond a reasonable doubt."[47] The Fifth Circuit has summarized the Supreme Court's standards for considering an actual innocence claim:

> This "claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." Proving such a claim is "daunting indeed," requiring the petitioner to show, "'as a factual matter, that he did not commit the crime of conviction.'" The petitioner "must support his allegations with new, reliable evidence that was not presented at trial and must show that it was 'more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" Such "new, reliable evidence" may include, by way of example, "exculpatory scientific evidence, credible declarations of guilt by another, trustworthy eyewitness accounts, and certain physical evidence."[48]

This Court held that Petitioner had presented sufficient evidence to warrant an evidentiary hearing on his actual innocence claim. The Court finds that at the evidentiary hearing, however, Petitioner failed to satisfy the factual innocence standard.

Petitioner presented three fact witnesses in his case-in-chief at an evidentiary hearing held on April 16 and May 20, 2014. The first, Renata Hughes, testified that she witnessed the shooting for which Petitioner was convicted when she was 13 years old. She testified that she saw John Wayne Palmer approach a group of men, including Derrick Hudson and Sherman Moses, to purchase crack cocaine. She witnessed Palmer and Hudson walk into the alleyway to make a drug transaction. She testified that Palmer

---

[47] *Schlup*, 513 U.S. at 324 (citing *Murray*, 477 U.S. at 485); House v. Bell, 547 U.S. 518, 536–37 (2006).

[48] McGowen v. Thaler, 675 F.3d 482, 499–500 (5th Cir. 2012) (footnotes omitted and citations omitted).

rejected the drugs that Hudson offered and attempted to walk away. She testified that Hudson then grabbed Palmer, pulled a gun out of his pocket, and hit Palmer in the head with the gun. Palmer then attempted to run, and Hudson shot him in the back. Hughes testified that she did not see Petitioner at the apartment complex that day.

Despite this testimony, the Court did not find Hughes to be a credible witness. In assessing new evidence presented to show actual innocence, "the court may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence."[49] Hughes admitted that she visited Petitioner in prison several times in 1998 and 1999—six years before she completed an affidavit in this case. Hughes described Petitioner as a "mutual friend," and Petitioner also testified that they were just friends. Hughes testified that she speaks on the phone to Petitioner as much as every other day. Petitioner, however, admitted that they speak on the phone several times a day and even as many as 15 times per day. The prison telephone records presented by the State at the hearing confirmed that the pair spoke on a daily basis. In his post-trial briefing, Petitioner now admits that the pair has a "romantic relationship." [50] Accordingly, Hughes misrepresented her relationship with Petitioner to this Court.

Hughes further testified on multiple occasions that she had not discussed her testimony at the evidentiary hearing with Petitioner. Petitioner, however, admitted that they had discussed certain aspects of Hughes's testimony. The recordings of prison phone calls between the two

---

[49] *Schlup*, 513 U.S. at 332.
[50] Doc. 93.

13

played at the hearing confirmed this. Again, Hughes was untruthful to this Court about her discussions with Petitioner regarding her testimony at the hearing.

Further, Hughes first completed an affidavit in 2005 in this matter describing her recollection of the event. She later signed two additional affidavits, each with varying degrees of inconsistency from the first. For example, the second affidavit described the shooting as occurring across the street and included a diagram purportedly drawn by Hughes reflecting that description. At the hearing, Hughes denied that she drew the diagram and admitted that she did not check the subsequent affidavits for accuracy before signing them. In light of Hughes's close personal relationship with the Petitioner and this Court's real concern regarding her character for truthfulness, the Court does not find Hughes's testimony credible or trustworthy.

Petitioner next presented the testimony of his aunt, Naomi Brown. Brown testified that on the morning of the shooting she dropped Petitioner off at his girlfriend's house about 20 minutes away from the Jefferson Place Apartments where the shooting occurred. She testified that she heard the shooting and saw the victim collapse but did not see who shot him. She also testified that she did not see Petitioner in the area at the time.

Petitioner also presented the testimony of Troy McCloud, the cousin of the victim John Wayne Palmer. McCloud testified that he saw Petitioner at Kim's Convenience Store about 45 minutes to an hour prior to the shooting. McCloud then walked 10 or 15 minutes from Kim's to the Jefferson Place Apartments where he saw Palmer. He testified that after speaking with Palmer, he saw Palmer approach some unknown men to attempt to buy crack

cocaine. McCloud testified that he later heard the shooting and saw Palmer collapse but did not see who shot him. He also testified that he did not see Petitioner in the area at the time but acknowledged that Petitioner would have had time to walk from Kim's to Jefferson Place Apartments prior to the shooting. McCloud also admitted that he was high the day of the shooting, and indeed, that he was "high every day."[51]

Although the testimonies of Brown and McCloud corroborate Petitioner's version of events, they do not show his actual innocence. Neither witness saw the shooting nor verified Petitioner's alibi. When considered in conjunction with the eyewitness testimony of Hudson and Moses presented at trial, this Court cannot say that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."[52] Accordingly, Petitioner has not shown his actual innocence, and the claims in his Amended Complaint are therefore procedurally defaulted. These claims are denied and dismissed with prejudice.

## II.   Supplemental Petition

Next, the Court considers Petitioner's supplemental *Brady* claim arising out of the grand jury testimony disclosed after the evidentiary hearing held in this Court in 2014. Petitioner has exhausted state court review of his supplemental *Brady* claim, and it is not in procedural default. This Court has already held that the unavailability of the grand jury transcript provided adequate excuse for Petitioner's delayed presentation of this claim.[53] Accordingly, this claim is timely under the AEDPA.

---

[51] Doc. 86 at p. 106.
[52] *Schlup*, 513 U.S. at 324.
[53] *See* Doc. 97 at p. 15–16.

In his supplemental claim, Petitioner asserts that the State violated his *Brady* due process rights when it withheld the grand jury testimony of Sergeant Maggie Snow,[54] the lead investigator, and Michelle Temple, the victim's girlfriend. He argues that the grand jury testimony at issue is inconsistent with the witnesses' trial testimony and tends to show that Derrick Hudson, not Petitioner, shot the victim.[55]

In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[56] "To establish a *Brady* claim, the petitioner must demonstrate: (1) the prosecutor suppressed evidence, (2) favorable to the defense, and (3) material to guilt or punishment."[57] Here, the State does not contest the first two *Brady* elements, admitting that the grand jury testimony at issue was withheld and that it was favorable in part to Petitioner's defense. Accordingly, the only issue before this Court is whether the testimony was material to Petitioner's guilt.

Suppressed evidence is material if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[58] "To prevail on his *Brady* claim, [Petitioner] need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted. He must show only that the

---

[54] Sgt. Snow is now Deputy Chief Pernia.

[55] Doc. 122 at p.2.

[56] *Brady*, 373 U.S. at 87.

[57] Pippin v. Dretke, 434 F.3d 782, 789 (5th Cir. 2005).

[58] *Id.*

new evidence is sufficient to 'undermine confidence' in the verdict."[59]
"[W]ithheld evidence is more likely material when the State presents a
weaker case for guilt."[60] Further, the materiality of suppressed evidence is
considered "collectively, not item by item."[61]

The Court will first outline the grand jury testimony at issue and the
ways in which it differs from the testimony presented at trial. Then, the
Court will detail the state courts' opinions on Petitioner's post-conviction
relief application regarding the grand jury testimony. Finally, the Court will
consider whether the state court was reasonable in its application of *Brady* to
this matter.

### A.   Grand Jury Testimony

#### a.   *Sgt. Snow*

In the grand jury testimony recently disclosed to Petitioner, Sgt. Snow
testified that she interviewed Moses during the course of the investigation.
Sgt. Snow testified that Moses told her that Hudson and Petitioner beat and
robbed Palmer before shooting him. As a result of this evidence, Sgt. Snow
testified that "we'll be getting a warrant for him [Hudson] shortly."[62] In
response to further questioning regarding Hudson's proposed charge, she
testified, "First degree murder since he was with the subject.   They robbed
him and shot him.   [Hudson] did the robbing. It was a cooperative effort on
both of them."[63] Sgt. Snow also testified that Temple was able to identify
Petitioner as being present at the scene.[64]

---

[59] Wearry v. Cain, 136 S. Ct. 1002, 1006 (2016).
[60] Floyd v. Vannoy, 894 F.3d 143, 166 (5th Cir. 2018).
[61] *Id*. at 162.
[62] St. Rec. Vol. 19 of 27, Grand Jury Testimony, 3/11/93.
[63] *Id*.
[64] *Id*.

At trial, however, Sgt. Snow identified Hudson as merely a witness to the incident.[65] She did not mention his involvement in the murder or any intention to charge him for that involvement. She testified that she showed a photograph lineup to Temple that included a picture of Hudson, but not Petitioner, and that Temple was unable to identify anyone she had seen at the scene.[66] She testified that despite her efforts, she was unable to locate Hudson until shortly before trial.[67]

At trial, Hudson testified that it was Petitioner who attempted to sell crack to Palmer in the alley.[68] Hudson testified that, after Petitioner sold the drugs to Palmer, Petitioner hit Palmer in the face with his gun, robbed him, and shot him as he ran away.[69] Hudson claimed that he was a mere bystander to the shooting.[70]

The trial court held a hearing outside the presence of the jury to determine whether Hudson had been offered anything by the State in exchange for his testimony.[71] Hudson testified that, in the weeks before trial, he was arrested on charges of possession and distribution of cocaine.[72] While he was in jail, he was approached by Sgt. Snow and the District Attorney's office.[73] He testified that they "reminded him about the shooting at Jefferson Place" and asked him if he remembered being there and seeing what happened.[74] He testified that he told them his version of events and insisted

---

[65] Doc. 14-18, Trial Transcript Vol. 2.
[66] *Id.*
[67] *Id.*
[68] Doc. 14-19, Trial Transcript Vol. 2.
[69] *Id.*
[70] *Id.*
[71] *Id.*
[72] *Id.*
[73] *Id.*
[74] *Id.*

that he was never promised anything in exchange for his testimony.[75] On cross-examination, he admitted that he never made any attempt to contact anyone regarding the shooting and that he was interviewed for the first time approximately one week before trial.[76] He also testified that he was offering testimony at the trial because he "wanted to get out" and he "didn't want to go down."[77] The trial judge found that there was no deal in place and ruled that the jury would not be permitted to know that Hudson was in jail or that he had pending criminal charges.[78] The jury was likewise not informed of Sgt. Snow's original intention to charge Hudson in Palmer's murder.

Moses testified at trial that, after Petitioner and Hudson went into the alley, Petitioner struck Palmer in the face with his gun.[79] Hudson then reached over, took Palmer's jewelry, and told Petitioner that he could have the money.[80] Palmer began pleading, "Please, don't shoot me," just before Petitioner shot him.[81] After he was shot, Palmer got up and ran a short distance.[82] While he was running away, Petitioner shot Palmer three more times, hitting him in the back of the head.[83]

### b.   *Michelle Temple*

Temple gave the following testimony before the grand jury:

Q.   Did you see the guy that shot him?
A.   Yes.
Q.   Did you see pictures of him later and were you able to identify him?

---

[75] *Id.*
[76] *Id.*
[77] *Id.*
[78] *Id.*
[79] *Id.*
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] *Id.*

A.     The pictures - - a detective has shown me some pictures
       and I said that that was him.

Q.     And that was the man that you saw?

A.     Yes.

Q.     Did you actually see the shooting?

A.     Yes.

Q.     You actually saw him shoot John Palmer?

A.     I seen the gun to his head and I had got out the car and
       he was already shot, but I had seen the gun to his head.

Q.     You saw the guy Jessie Grace holding the gun to his
       head?

A.     Yes.

Q.     And you got out of the car and then he was shot?

A.     Yes.
       . . .

Q.     What did you do then?

A.     I ran after Jessie and the boy they called Nam [Hudson],
       but they were running down the street and I went back by
       John. He was on the ground.
       . . .

**A.**   I see him on the ground when I looked through the rearview
       mirror. And I turned around and he had the gun to his head and
       when I got out they had already shot him but I didn't hear any
       shots.[84]

At trial, the State called Temple to testify. Temple testified that she did
not know who shot Palmer and that she had never told anyone that she knew
who shot Palmer.[85] She also testified that Sgt. Snow had showed her several
photos but that she could not identify anyone that she had seen around
Palmer's body.[86] She testified that she saw many people running from the
crime scene after the shooting but that the only people she recognized were

---

[84] St. Rec. Vol. 19 of 27, Grand Jury Testimony, 3/11/93.
[85] Doc. 14-18, Trial Transcript Vol. 2.
[86] *Id.*

Moses and "Jamal."[87] She described the person kneeling next to Palmer as 5'4" or 5'5", 140–150 lbs., dark, medium build, between 19 and 20 years old and wearing "blue Dickey pants with a dark blue Raiders jacket."[88] She testified that she did not know what he had in his hand.[89]

### B. State Court Decisions

Petitioner argued this *Brady* claim in his third state court post-conviction relief application. The state trial court held an evidentiary hearing, at which the trial prosecutor and Sgt. Snow testified.[90] The state trial court found that the withheld grand jury transcript contained evidence favorable to Petitioner on each point asserted—Temple's possible identification of Hudson's photograph as the murderer, Snow's designation of Hudson as a co-perpetrator and failure to arrest him, and Snow's incorrect testimony that Temple placed Petitioner at the scene.[91] The state trial court concluded that these portions of the grand jury transcript, in context with the entire record, constituted new evidence that called into question Snow's credibility, Hudson's credibility and motives, and the prosecution's relationship with or favorable treatment of Hudson.[92] The court found that whether or not Hudson was given a "deal" by the prosecution, "he was obviously treated favorably by the State, as he was never arrested or charged for the homicide."[93] The court held that the withheld favorable information weakened confidence in the verdict and the

---

[87] *Id.*

[88] *Id.*

[89] *Id.*

[90] St. Rec. Vol. 19 of 27, Trial Court Order, 7/17/17.

[91] *Id.*

[92] *Id.*

[93] *Id.*

direct appeal.[94]   The state trial court granted relief and ordered a new trial.[95]

The State sought review of this ruling in the Louisiana Fifth Circuit Court of Appeal. Because the State did not contest favorableness or suppression under *Brady*, the appellate court focused its review on materiality when it granted the State's writ application.[96] The Louisiana Fifth Circuit found that the trial court abused its discretion and held that the grand jury testimony was not material and its suppression did not undermine confidence in the outcome of Petitioner's trial.[97]

First, the court pointed out that, even if the jury did not hear about Sgt. Snow's intent to arrest Hudson, Moses testified as to Hudson's involvement in the crime and therefore the jury "heard the underlying evidence on which Detective [Snow] determined that Hudson was culpable."[98] While the court noted that the failure to charge Hudson was "suspect," it concluded that the failure was likely "oversight" because no one took over the investigation while Sgt. Snow was out on maternity leave.[99] It noted that there was "absolutely no evidence to suggest that there was a deal, formal or informal, between Hudson and the State for leniency in exchange for his testimony against defendant."[100] Finally, it concluded that "the fact that Hudson was not arrested for the instant murder has no bearing on defendant's culpability in the instant case."[101]

Second, the court found that Temple's inconsistent grand jury

---

[94] *Id.*
[95] St. Rec. Vol. 19 of 27, Trial Court Order, 7/17/17.
[96] St. Rec. Vol. 19 of 27, 5th Cir. Order, 17-KH-451, 11/14/17.
[97] *Id.* at 6, 12.
[98] *Id.* at 7
[99] *Id.*
[100] *Id.*

testimony was not material where her multiple inconsistent statements throughout the investigation and trial were known to defense and available to attack her credibility.[102] It further noted that despite her testimony that she identified the perpetrator from a photograph lineup, no evidence established any positive identification of Hudson as the shooter.[103] The Louisiana Fifth Circuit found it significant that, because Temple had not seen the shooting, her trial testimony "was not relevant to the actual shooting or identity of the perpetrator," and instead served only to outline the events leading up to and after the shooting.[104] The appellate court also relied on the fact that the jury heard Sgt. Snow's trial testimony that Temple was shown a photographic lineup with Hudson's picture and that Temple was unable to positively identify anyone in it.[105]

Finally, the court found that Snow's unsupported grand jury testimony that Temple placed Petitioner at the scene was not material under *Brady* where, given Temple's multiple inconsistent statements, it was "not unreasonable to think" that she told Sgt. Snow that she had seen Petitioner at the scene at some point in the investigation.[106] In addition, the court noted that Temple herself testified to the grand jury that Petitioner was at the scene with a gun in his hand.

The Louisiana Fifth Circuit summarized its findings as follows:

> In sum, we find that the district court erred in its finding that the suppressed evidence undermined confidence in the outcome of the trial. Rather, we find that the State's failure to disclose portions of the grand jury transcript does not constitute

---

[101] *Id.*
[102] *Id.*
[103] *Id.* at 7–8.
[104] *Id.*
[105] *Id.*
[106] *Id.*

a *Brady* violation. Specifically, the suppressed evidence is not material because while it inculpates Hudson, it does not, in any way, exculpate defendant as to his participation in the commission of the murder. Considering the evidence presented at trial, there is not a reasonable probability that the result of the proceeding would have been an acquittal or a lesser verdict if the suppressed grand jury testimony had been disclosed to the defense.

Even discounting Hudson's testimony at trial about defendant's involvement in the crime, the jury heard Moses' testimony that defendant shot the victim. Specifically, Moses testified that he saw defendant with a black .38 revolver; he saw defendant hit the victim in the mouth with the .38 revolver causing the victim to fall; he saw Hudson "snatch" the victim's jewelry; he heard the victim beg him not to shoot; and he saw the victim walk off and defendant shoot him in the back of his head. Moreover, on appeal, this Court stated:

As a witness to the shooting, Hudson's testimony was clearly important. However, his testimony was not only uncontradicted, it was also corroborated by the testimony of Sherman Moses. As did Hudson, Moses witnessed the defendant strike the victim in the face with a gun. An autopsy revealed that the victim's facial lacerations were the result of a blow by a blunt object. Further, both Hudson and Moses testified that the victim pled with the defendant prior to being shot by what Moses described as a "black 38, snubbed nose." The testimony of a firearms expert revealed that the two bullets removed from the victim's body were fired from a thirty-eight-caliber revolver.[107]

Based on its conclusion that the grand jury testimony was not material under *Brady*, the Louisiana Fifth Circuit denied relief and reinstated Petitioner's conviction and life sentence.[108]

Petitioner sought review of this ruling in the Louisiana Supreme Court. The court denied his writ application stating only that

---

[107] *Id.* at 9–10.

"[r]elator fails to show that the state withheld material exculpatory evidence in violation of *Brady*."[109]

### C.   Analysis

Under § 2254(d)(1), the question before this Court is whether the state court's denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent. Under this highly deferential standard, a federal habeas court must look to the last reasoned state court decision to determine whether that ruling "so lack[ed] in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."[110] As noted by Petitioner and the State, when faced with an unexplained decision, the habeas court "should 'look through' the unexplained decision to the last related state-court decision providing" particular reasons, both legal and factual, "presume that the unexplained decision adopted the same reasoning," and give appropriate deference to that decision.[111] Both Petitioner and the State contend that, under *Wilson v. Sellers*, the Louisiana Supreme Court's decision denying Petitioner's last writ application was not the last reasoned state court opinion because it did not explain its one sentence opinion.[112] Thus, they conclude, this federal habeas court must look to the Louisiana Fifth Circuit's findings to apply the AEDPA standard of review.

---

[108] *Id.*

[109] State v. Grace, 264 So. 3d 431 (La. 2019); St. Rec. Vol. 19 of 27; La. S. Ct. Order, 2017-KP-2070 (2/25/2019).

[110] *White*, 572 U.S. at 419–20 (quoting *Harrington*, 562 U.S. at 103)

[111] Wilson v. Sellers, 138 S. Ct. 1188, 1191–92 (2018).

[112] *Id.*

However, the decision in *Wilson* addressed opinions that provide no reasoning at all.[113] The Louisiana Supreme Court stated that Petitioner's writ application was denied because he failed to "show that the state withheld material exculpatory evidence in violation of *Brady*."[114] The Louisiana Supreme Court's opinion here was not the type of "one-word" and "unexplained" denial of relief discussed by the United States Supreme Court in *Wilson*.[115] Indeed, the Fifth Circuit has explained that *Wilson* "indicates that a federal habeas court should 'look through' to the last reasoned state court decision to determine the *general basis* for a state appeals court's ruling."[116] Here, the general basis for the Louisiana Supreme Court's writ denial is clear. Accordingly, this Court will consider whether the Louisiana Supreme Court's finding that Petitioner failed to show that the state withheld material exculpatory evidence in violation of *Brady* was contrary to or an unreasonable application of United States Supreme Court precedent.[117] This Court finds that it was.

Petitioner was convicted wholly on the eyewitness testimonies of Hudson and Moses. There was no physical or forensic proof in this case, and Petitioner did not make a statement. The undisclosed grand jury testimony of Sgt. Snow raises significant questions regarding Hudson's credibility and motivation for testifying. Sgt. Snow's grand jury testimony established Hudson as a co-perpetrator who would be arrested for his involvement in the

---

[113] *Id.*

[114] State v. Grace, 264 So. 3d 431 (La. 2019); St. Rec. Vol. 19 of 27; La. S. Ct. Order, 2017-KP-2070 (2/25/2019).

[115] *Wilson*, 138 S. Ct. at 1191–92.

[116] Green v. Lumpkin, No. 19-70019, 2021 WL 2786461, at *7 (5th Cir. 2021) (emphasis added).

[117] Further, the Court considers only the grand jury transcript, "and the effect, if any, that its suppression had on the jury trial." Banks v. Thaler, 583 F.3d 295, 311 (5th Cir. 2009). It cannot "reconsider already-disposed-of habeas issues." *Id.*

murder. At trial, he was treated as merely a witness, and the jury was not made aware of Sgt. Snow's prior intent to charge him with first degree murder.

The State makes much of the fact that there has been no evidence of a deal between Hudson and the State. The Fifth Circuit has made clear, however, that whether a witness made a deal with the State is not dispositive.[118] "What counts is whether the witness may be shading his testimony in an effort to please the prosecution."[119] The Fifth Circuit has found that the Confrontation Clause was violated when a defendant was not permitted to cross-examine a witness-accomplice on his vulnerability to prosecution on an unrelated charge at the time that he testified.[120] The court held that "the crucial factor is whether the jury might have been persuaded that [the witness's] vulnerability to prosecution made him wish to assist the state and that this motivation compromised his credibility."[121] Indeed, "[a] desire to cooperate may be formed beneath the conscious level, in a manner not apparent even to the witness, but such a subtle desire to assist the state nevertheless may cloud his perception."[122]

Here, Petitioner could have explored the effect of Hudson's vulnerability to prosecution in this matter had he been aware of Sgt. Snow's prior intention to charge Hudson in the murder.[123] "Certainly the fear of additional . . . charges and prosecution might motivate a witness to testify

---

[118] Carrillo v. Perkins, 723 F.2d 1165, 1169–70 (5th Cir. 1984).

[119] *Id.*

[120] *Id.*

[121] *Id.* at 1170.

[122] Greene v. Wainwright, 634 F.2d 272, 276 (5th Cir. 1981).

[123] This Court does not find compelling the State's argument that Sgt. Snow's grand jury testimony would not be admissible at trial. Neither Louisiana Code of Evidence articles 609.1 nor 607 would prevent introduction of the statement on cross-examination of Sgt. Snow.

favorably on behalf of the government."[124]  Further, the fact that Hudson was not charged (and indeed, has never been charged) for his involvement in the crime is favorable treatment of which the jury should have been made aware. This favorable treatment unquestionably bears on his credibility and motivation for testifying.

The favorable treatment also implicates the credibility of the lead detective in this matter, Sgt. Snow. The State does not point to any instant in the investigation of Palmer's murder that Hudson's role in the matter reasonably went from co-perpetrator to eyewitness. Further, Sgt. Snow misstated to the grand jury that Temple had placed Petitioner at the scene of the crime. These discrepancies call into question Sgt. Snow's credibility.

Finally, Temple's grand jury testimony differed so vastly from her trial testimony that she could not have been telling the truth in both instances. At trial, the jury heard that Temple did not identify anyone from the photograph lineup and that Hudson was the only one pictured in that lineup. Temple's grand jury testimony, on the other hand, suggests that she identified Hudson, not Petitioner, as the man holding a gun to Palmer's head while he lay on the ground. Suppression of this evidence hindered Petitioner from making the reasonable argument that the man seen holding a gun to Palmer's head immediately after he was shot was the same man that shot him. Further, Temple's physical description at trial of the man that she saw holding something to Palmer's head also matched Moses's earlier description of Hudson, not Petitioner. At the very least, Temple's grand jury testimony calls into question her credibility and the veracity of her testimony at trial. At most, it inculpates Hudson as the perpetrator of the crime.

---

[124]  United States v. Crumley, 565 F.2d 945, 950 (5th Cir. 1978).

The revelations of the grand jury testimony therefore leave only Moses's testimony unaffected. Moses's trial testimony, however, is also not above reproach. Therein, Moses admitted that he was on drugs at the time of the shooting—having smoked a "whole dime bag," or eight or nine joints, of marijuana the day of the shooting. Moses testified that prior to returning to the scene of the crime to speak with police, he heard that rumors were spreading that he was involved in the shooting—suggesting a motive for pointing the finger at anyone else. Finally, Moses also admitted that he had previously been convicted of purse snatching and motorbike theft and that he had a pending charge for possession of stolen property. He testified that, despite his pending charge, the State had not made any promises to him in exchange for his testimony.

The grand jury testimony raises significant credibility concerns regarding two of the three witnesses who were present at the murder as well as its lead investigator. "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."[125] Here, Petitioner's guilt rested solely on the eyewitness testimonies of Hudson and Moses. The grand jury testimony raises serious credibility concerns regarding Hudson, and indeed, may even inculpate him as the murderer—leaving only the eyewitness testimony of Moses, a felon high on drugs with a motive to point the finger elsewhere, to support the conviction. It is well settled that "withheld evidence is more likely material when the State presents a weaker case for guilt."[126] This Court, like the state trial court and the dissenting

---

[125] Napue v. People of State of Ill., 360 U.S. 264, 269 (1959).
[126] *Floyd*, 894 F.3d at 166.

judges at both the Louisiana Fifth Circuit Court of Appeal and Louisiana Supreme Court, finds that the grand jury testimony is sufficient to undermine confidence in the verdict and is therefore material.

Further, the Court finds that a decision that the grand jury testimony of Snow and Temple is not material is objectively unreasonable. To find otherwise, the state court necessarily engaged in assumptions and post-hoc justifications for the revelations of the grand jury testimony. "It is not the role of a court applying *Brady* to weigh the existing evidence against the excluded evidence, but rather to ask whether the excluded evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."[127] This Court holds that it can.

<u>CONCLUSION</u>

For the foregoing reasons, Petitioner's Amended Petition for Habeas relief is **DENIED**, and his Corrected Second Supplemental Petition for Habeas relief is **GRANTED**. The conviction of Petitioner Jessie James Grace III violates the clearly established federal law in *Brady v. Maryland*.

**IT IS FURTHER ORDERED** that the State of Louisiana is hereby ordered to either retry Petitioner or release him within 120 days of this Order.

New Orleans, Louisiana, this 2nd day of December, 2021.

_____

---

[127] DiLosa v. Cain, 279 F.3d 259, 264 (5th Cir. 2002).

30